# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 24, 2012

## STATE OF TENNESSEE v. LEIA MELLOTT

**Appeal from the Criminal Court for Hamblen County**
**No. 10CR279      John Dugger, Jr., Judge**

---

**No. E2012-00278-CCA-R3-CD - Filed February 19, 2013**

---

The Defendant, Leia Mellott, challenges her jury conviction for filing a false report, contending that the evidence presented at trial was insufficient to sustain her conviction. Following our review, we conclude that the evidence is insufficient to support the jury's verdict that the Defendant made a knowingly false statement to law enforcement to obstruct their apprehension of a fugitive and reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Greg W. Eichelman, District Public Defender; and DeAnna M. Snyder, Assistant Public Defender, for the appellant, Leia Mellott.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Dan Armstrong, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

The record reflects that the Defendant was indicted on March 1, 2011, for filing a false police report, a Class D felony, in connection with the United States Marshall Service's attempt to apprehend a fugitive. A jury convicted the Defendant of the charged offense on November 29, 2011.

The following evidence was adduced at trial. Detective Sergeant Frank Lane,

employed with the Hamblen County Sheriff's Department, testified that he was contacted by the United States Marshall Service (U.S. Marshalls) and asked to assist in surveilling a house on Raven Wood Road in Hamblen County. He explained that the U.S. Marshalls wanted to surveil the house because they were attempting to apprehend a fugitive named Vincent Boyd. Det. Lane agreed to assist, and on May 26, 2010, he and other officers began their surveillance of the house.[1] Det. Lane testified that during their surveillance, Vincent Boyd exited the home and was standing on the porch smoking a cigarette. He surmised that Vincent Boyd must have seen one of the officers because he "threw a cigarette and ran back into the house very quickly." Det. Lane and four other officers entered the home, with their guns drawn, to take Vincent Boyd into custody. When Det. Lane entered the house, he saw the Defendant in the living room. He and the other officers "secured anybody that was in the house into the living room area so [they] could give search through the rest of the house to try to apprehend [Vincent Boyd]." Det. Lane then asked the Defendant "where Vincent Boyd was." She responded, "I don't know." Det. Lane testified that he took the Defendant's response "to mean that she d[id]n't know where he [wa]s at." Vincent Boyd was later located in the garage hiding under boxes. Det. Lane testified that there was access to the garage without going outside and that, from inside the home, the Defendant would have to pass through the living room to get to the garage.

Special Agent Buddy Erly with the Federal Bureau of Investigation (FBI) testified that in March 2009, he interviewed the Defendant regarding Vincent Boyd. Agent Erly explained that during his investigation into the whereabouts of Vincent Boyd, he learned from two different sources that the Defendant was Vincent Boyd's girlfriend and that someone in the house had made contact with Vincent Boyd via computer. Agent Erly testified that during the interview, he explained to the Defendant that they were looking for her boyfriend because he had sexual abuse-related warrants out of Green Bay, Wisconsin. The Defendant told Agent Erly that she had not seen Vincent Boyd since October 2008 when she dropped him off in Niagra Falls in route to see her father. He informed the Defendant about Vincent Boyd's pending and current charges and asked how she felt about the information given that she had small children in the home. The Defendant was not initially aware that Vincent Boyd had been charged with sexual offenses against children, but she told him that she was pregnant by Vincent Boyd and said that "she wouldn't have any problem being around him with the new baby on the way." Agent Erly testified that he believed some parts of the Defendant's story were true but that he was uncertain about other parts. He also testified that at the conclusion of the interview, he gave the Defendant his card and requested that she call him if she saw Vincent Boyd.

The Defendant also testified at trial. She confirmed that Agent Erly interviewed her

---

[1] According to Det. Lane there were both "Task Force" officers and U.S. Marshalls present at this time.

in March 2009 and said that she explained to him that she had not seen Vincent Boyd since October 2008. The Defendant denied that Agent Erly told her the nature of the charges against Vincent Boyd and stated that she was unaware that he had child sexual abuse charges pending until her incarceration on the charge in the instant case. The Defendant testified that on May 24, 2010, Vincent Boyd was brought to her home by a mutual friend. She explained that she was surprised by this visit because the friend had previously told her that he had no contact with Vincent Boyd. The Defendant testified that she told Vincent Boyd that law enforcement had been to her home looking for him and that he told her that he had taken care of the situation. She explained that she allowed Vincent Boyd to stay that night but that she got up early the next morning, retrieved Agent Erly's card, and called him to inform him that Vincent Boyd was in her home. The Defendant further explained that she waited until the following morning because she did not want Vincent Boyd to know what she was doing. The Defendant testified that Agent Erly's voice message stated that he had been transferred to Atlanta, so she left a message informing him that she was calling in regards to Vincent Boyd. The Defendant testified that no one from law enforcement ever called her back, so she believed that Vincent Boyd was telling the truth about having taken care of the situation with police; she allowed him to stay another night. That morning, she had just put her infant to sleep in a stroller in the living room, and Vincent Boyd was on her porch smoking a cigarette when he rushed back inside. The Defendant testified that she could hear people approaching her home and that her dog, a 102-pound Great Dane, was "going berserk." She explained that Det. Lane and other officers came to her door, pointing their guns. The Defendant testified that Det. Lane asked her, "where is he?" She replied, "I don't know." She further testified that she believed that Det. Lane was asking her where Vincent Boyd was located. She explained that despite her vantage point in the living room, she did not see which direction Vincent Boyd went because she was trying to calm her large dog and keep him from knocking over the stroller where her infant daughter was sleeping.

On cross-examination, the Defendant testified that there are only two ways to exit the living room: through the kitchen or the living room. However, she explained that she did not know where Vincent Boyd was because "there were . . . two doors . . . one in the kitchen that took you out to the back door or to the back porch . . . and then a sliding glass door. The State then asked the Defendant,

> Q    And you don't think that a more truthful answer to the officers would have been he came in the living room and went out that door.
>
> A    No, sir. I--
>
> Q.    Why wouldn't that have been more truthful, Ms. Mellott?

A.    I couldn't cut -- It was kind of hard to think at that point with guns being pointed at my daughter.

The Defense then rested its case. After a short deliberation, the jury found the Defendant guilty of false reporting and imposed a $2,500 fine. The trial court sentenced the Defendant to serve two years and nine months in the Department of Correction, suspended to probation after the Defendant's service of 120 days.

## ANALYSIS

The Defendant contends that the State presented insufficient evidence at trial to sustain her conviction for filing a false police report. The State contends that there was sufficient evidence presented for the jury to conclude that the Defendant was guilty.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and

circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, a person is guilty of filing a false police report if he or she engages in any of the following acts:

(2) Make a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false and with the intent to obstruct or hinder the officer from:

(A) Preventing the offense or incident from occurring or continuing to occur; or

(B) Apprehending or locating another person suspected of committing an offense.

Tenn. Code Ann. § 39-16-502 (a)(2) (emphasis added).

Relying on State v. Levandowski, 955 S.W.2d 603 (Tenn. 1997), the Defendant contends that she did not initiate a conversation with Det. Lane and cannot be convicted for filing a false police report when her statement was in response to questions from law enforcement. However, as the State notes, the Defendant's reliance on Levandowski is misplaced because in that case the defendant's conviction was based on an older statute. Unlike the defendant in Levandowski, the statute under which the Defendant was convicted does not make a distinction between whether or not the defendant initiated the conversation or whether the offending statement was made in response to an officer's question.[2] See Tenn. Code Ann. § 39-16-502 (a)(2)(B); see also Levandowski, 955 S.W.2d at 604-05.

---

[2] After the Levandowski case was decided, the Tennessee Legislature changed the false reporting statute to make its applicability broader, following some of the suggestions posed by the majority and dissenting opinions.

The Defendant also contends that "she answered Detective Lane honestly." Nevertheless, a jury found the Defendant guilty of violating section (a)(2)(B) of the above-referenced statute when she told law enforcement officers that she did not know where Vincent Boyd was located. Even viewed in a light most favorable to the State, we cannot conclude that the evidence presented to the jury was sufficient to sustain her conviction for filing a false report. The evidence showed that the Defendant was standing in her living room when Vincent Boyd ran back into the house. Law enforcement saw Vincent Boyd run into the house, and they pursued him. Upon entering the home, Det. Lane encountered the Defendant in the living room area. When Det. Lane asked the Defendant, "where is he," the Defendant's response was, "I don't know." Despite the State's argument that the Defendant was standing in a position in which she could see every exit from the living room area and that it was impossible that she did not know from which door Vincent Boyd exited the living room, the Defendant was never asked that question. The plain meaning of the question, "where is he?," suggests that one is inquiring about location; and the plain meaning of the question, "which way did he go?," suggests that one is inquiring about direction. They are two distinct questions, and the Defendant cannot be guilty of falsely answering a question that she was never asked. While it is entirely possible that the Defendant actually knew in which direction Vincent Boyd fled, that is not the question Det. Lane asked her, and he never asked a follow-up question soliciting additional information. Det. Lane only asked the Defendant one question, "where Vincent Boyd was?" While the jury may make reasonable inferences from the evidence, it is not free to change the evidence as presented.

Black's Law Dictionary defines false as synonymous with the following words: "untrue," "deceitful," "lying." Black's Law Dictionary (9th ed. 2009). As the cross-examination questioning mentioned above reflects, the State seems to allege that the Defendant could have provided the officers with "a more truthful answer" to Det. Lane's question of where was Vincent Boyd. However, this court applies the plain meaning of words, and the statute with which the Defendant is charged with offending requires the statement to be knowingly false. See Tenn. Code Ann. § 39-16-502 (a)(2); see also Hayes v. Gibson County, 288 S.W.3d 334, 337 (Tenn. 2009). Whether or not the Defendant could have provided a more truthful answer to the officer's question is completely irrelevant to the issue of whether the Defendant knowingly made a false statement. The State did not prove that her answer, "I don't know," was false as to the specific question, "where is he?" This conviction cannot rest on speculation and the supposition that the officer's question, "where is he?" really means "which way did he go when he ran back inside?"

Therefore, we conclude that the State's evidence was insufficient to prove that the Defendant's responsive statement to the officer's inquiry was knowingly false and was intended to hinder their apprehension of Vincent Boyd. For the foregoing reasons, the conviction must not stand.

## CONCLUSION

Accordingly, the judgment of the trial court is reversed, and the indictment is dismissed.

_____
D. KELLY THOMAS, JR., JUDGE